The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PARK HUNG QUAN,<br><br>Defendant. | No. CR19-0148 JCC<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)** |

Comes now the United States of America, by and through Brian T. Moran, United States Attorney for the Western District of Washington, and Andrew C. Friedman and Steven T. Masada, Assistant United States Attorneys for said District, and files this Government's Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A).

## I. INTRODUCTION

Park Hung Quan has a criminal history dating back to the 1970s. His prior convictions include felony convictions involving guns, explosives, and a murder-for-hire plot. Undeterred by three prior federal convictions for which he served a total of nearly 20 years of imprisonment, Quan amassed what can only be described as an arsenal in his South Seattle home. That arsenal included assault rifles, high-capacity magazines, bump stocks,

United States' Response to Defendant's Motion for Compassionate
Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 1
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ammunition, and explosive material. Quan's possession of these items was of obvious concern given his violent criminal history.

Barely three months ago, this Court sentenced Quan to a 48-month prison term for this conduct. Quan now seeks compassionate release, claiming that a temporary delay in his treatment for his prostate cancer warrants his immediate release. To the extent that there has been delay in Quan's treatment, that delay has been limited, it has been due in large part to the COVID-19 pandemic, and it might equally have occurred even if Quan were out of custody. Notably, Quan does not argue that BOP is not able to treat his prostate cancer, nor does he assert that BOP cannot accommodate his preferred treatment plan. BOP can and will treat Quan appropriately. BOP plans to transfer Quan to – the Federal Medical Center at Butner (FMC-Butner) this month, where he will receive the same radiation therapy that he would receive were he released, likely on a similar schedule.

In addition to his claim based on his need for treatment, Quan also appears to assert his age and medical condition, and the COVID-19 pandemic, as reasons for his release. Notably, however, Quan recently came down with COVID-19. Quan's case was mild, and he has now fully recovered. For all of these reasons, Quan has failed to show extraordinary and compelling reasons that would warrant his release, and his motion should be denied.

## II. FACTUAL BACKGROUND

### A. Quan's Criminal History

Quan has three prior felony convictions, all related to the illegal possession or attempted possession of weapons, one of which involved Quan's participation in a murder-for-hire plot. Quan's prior convictions include the following:

- In 1973, while enlisted in the Army, Quan was convicted by court-martial of (i) *Soliciting the Theft of Military Weapons* and (ii) of *Attempting to Steal Military Weapons*. According to the Probation Office, Quan was sentenced to five years in custody at Fort Leavenworth. These convictions resulted in his dishonorable discharge from the military. *See* Presentence Report ¶ 26 [hereinafter PSR].

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 2
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- In 1983, Quan was convicted of *Felon in Possession of Explosives*, in this District. This conviction arose from Quan's involvement in a contract-murder plot. Quan attached a bomb made from stolen explosives (sticks of dynamite) to the undercarriage of the intended target's vehicle. The attempted murder failed because the bomb malfunctioned.

  Although Quan claims now that the bomb failed because he detached wires to avoid injuring passing pedestrians, *see* Defendant's Mot. at 9, Quan does not provide any corroboration for this claim. Quan also does not explain why, if this is true, he failed to provide this explanation in prior filings in this case, despite the United States raising the subject repeatedly throughout the case.

  Quan ultimately cooperated with the government against his co-conspirators. As a result, he was allowed to plead guilty to only the explosives possession charge and he received a 120-month (10-year) custodial sentence. *See* PSR ¶ 27.

- In 1991, Quan was convicted of *Unlawful Possession of Unregistered Firearm (Machine Gun and Silencers)*, in the United States District Court for the Southern District of Texas. This offense, which occurred while Quan still was on supervision for his 1983 conviction, involved Quan's possession of 10 machineguns and a silencer. Quan was sentenced to 57 months in custody. *See* PSR ¶ 28.

**B.     Quan's Current Crime**

Despite being barred from possessing firearms by his prior convictions, Quan began acquiring firearms again following his release from imprisonment. By 2005 or 2006, Quan had acquired an assault rifle, a Steyr-Mannlicher, Model Steyr USR, .223 Remington caliber semi-automatic rifle. And, in the years that followed, Quan acquired a full arsenal.

On July 29, 2019, FBI Special Agents investigating a cybercrime (committed by one of Quan's roommates, and a crime to which Quan had no connection) executed a search warrant at Quan's South Seattle residence. *See* PSR ¶ 8. During that search, and a search pursuant to a second warrant, the agents found Quan's weapons and ammunition. Among other things, agents found:

- 12 firearms found in Quan's bedroom, including assault rifles, a sniper-style rifle, and semiautomatic pistols. Some of the guns were loaded, including at

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 3
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

least one of the semi-automatic assault rifles, which was loaded with a high-capacity magazine.

- Two bump stocks, designed to be attached to semiautomatic rifles in place of conventional stocks, enabling the rifles to fire bullets more rapidly, mimicking fully automatic weapons. (Bump stocks were, of course, used in, and made famous by, the 2017 Las Vegas, Nevada, mass shooting in which 59 people died.)

- Multiple high-capacity magazines.

- Thousands of rounds of ammunition, in various calibers, matching the seized firearms.

- Two 37mm "flare launchers," which could be used to shoot a variety of projectiles. And,

- Three containers of Pyrodex, a low explosive black powder substitute, as well as chemicals that could be used as precursors to make explosives.

*See* PSR ¶ 8; Plea Agreement ¶ 8 (Dkt. No. 48).

In a post-arrest interview, Quan acknowledged that, based on his prior felony convictions, he knew it was illegal for him to possess firearms. *See* PSR ¶ 9. Quan also stated that he had acquired the bump stocks before they became illegal (thereby implicitly confessing knowledge of his subsequent illegal possession). *See* PSR ¶ 9. And, agents overheard Quan tell one of his housemates that he had not yet gotten the chance to mix the precursors for RDX, prompting one of the housemates to say, "shhhhh, shut up." RDX is an explosive chemical compound. *See* https://en.wikipedia.org/wiki/RDX.

Quan's possession of firearms and explosives was particularly troubling, because of Quan's criminal history, including his prior participation in the murder-for-hire case. It also was troubling because the items generally were unsecured and accessible to Quan's housemates. *See* PSR ¶ 8. This included Quan's housemate whose computer hacking had led to the search, who was the subject of a restraining orders, and who had made numerous

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 4
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

threats to harm others and herself, including threatening to "shoot up" the office of a California social media company.

**C.    Quan's Prosecution and Sentencing**

Quan was indicted for being a felon in possession of a firearm based upon his possession of the 12 firearms recovered from his bedroom. On June 12, 2020, Quan entered a guilty plea, pursuant to a Plea Agreement, under which both parties agreed to recommend that the Court impose a term of imprisonment of 48 months, which was below the anticipated advisory sentencing guidelines range. *See* Plea Agreement ¶ 11 (Dkt. No. 48).

Prior to sentencing, the Probation Office prepared a Presentence Report that recommended that the Court find that Quan had an Offense Level of 26, a Criminal History Category of III, and a sentencing range of 78-97 months. *See* PSR ¶ 73. The Presentence report described Quan's medical conditions, including the fact that Quan recently had been diagnosed with prostate cancer, that that cancer likely was Stage II, and that a prostatectomy followed by radiation was likely to be the recommended treatment. See PSR ¶ 46-51.

On October 14, 2020, the parties appeared before the Court for sentencing. Pursuant to the Plea Agreement, both parties recommended a 48-month term of imprisonment. The Court adopted the recommendations set forth in the Presentence Report and found that Quan had an Offense Level of 26, a Criminal History Category III, and an advisory sentencing range of 78-97 months. The Court followed the recommendation of the parties and imposed a custodial sentence of 48 months' imprisonment.  (The Court also recommended that Quan remain at the Federal Detention Center - SeaTac until his radiation treatment was complete, and then be placed at a Federal Medical Center, either in Butner or Devens.)

Quan, who has been detained since July 29, 2019, has now served just over 18 months of his sentence, most of it while detained pending trial. This represents less than half of the sentence, even factoring in good-time credit.

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 5
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**D.     Quan's Medical Condition.**

   **1.     *Quan's Prostate Cancer Diagnosis and Initial Treatment Plan***

The principal medical condition from which Quan currently suffers is prostate cancer. That cancer was discovered while Quan was detained pending sentencing. Quan was diagnosed with this condition by Dr. David Reed (a urologist who practices outside the Bureau of Prisons), on July 22, 2020. *See* Defendant's Mot. Exh. 1. The discovery of Quan's cancer -- and the resulting possibility that it can be effectively treated -- likely are results of Quan's incarceration. As noted in Quan's Presentence Report, "[Quan's] brother believes Mr. Quan's arrest is a blessing in disguise and he does not think Mr. Quan would have learned of his cancer otherwise." *See* PSR Sent. Rec.

Following additional testing, on September 16, 2020, Quan met with Dr. Reed and elected radiation treatment with hormonal suppression therapy, rather than a prostatectomy. *See* Defendant's Mot. Exh. 1. FDC SeaTac medical staff subsequently consulted with Dr. Reed, who approved Leuprolide Acetate as the drug to be used for the hormonal suppression. *See id.* Exh. 2. And, on October 6, 2020, FDC provided Quan his first injection of Leuprolide Acetate, which was to be given every 90 days. *See id.* Exh. 3.

On October 9, 2020, Quan met with Dr. Song (a radiologist who practices at Virginia Mason Medical Center). *See id.* Exh. 4. Dr. Song told Quan that he would have Dr. Reed put in fiducial markers, and that Quan would then need to undergo an MRI prior to commencing treatment. *See id.* Dr. Song indicated that he believed that Quan's radiation treatment would begin two-to-three months after Quan's first injection. *See id.* BOP scheduled Quan for an appointment with Dr. Reed in early January, within the two-to-three month window during which Dr. Song expected Quan's treatment to begin.

   **2.     *Quan's COVID-19***

On December 30, 2020, Quan tested positive for COVID-19. *See id.* Exh. 5. Fortunately, Quan's case appears to have been very mild, and Quan's symptoms, appear to have been very limited, if any. *See* Brunner Decl. Exh. A at 10-13. ("Brunner Decl." refers

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 6
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

to a declaration by AUSA Helen Brunner filed in conjunction with this pleading.) On January 11, 2021, Quan was released from isolation. *See id*. at 13.

### 3. Quan's Current Treatment Plan

Quan's COVID-19 diagnosis necessarily resulted in some delay in the treatment of his prostate cancer. For instance, it resulted in the cancellation of a scheduled visit to Dr. Reed for placement of fiducial markers. *See* Defendant's Mot. Exh. 5. Shortly, thereafter, BOP decided that Quan should be treated at FMC-Butner, where it had designated him to serve his sentence based upon his age and diagnosis. *See* Brunner Decl. ¶ 4 & Exh. A at 6.

In making the decision to treat Quan at FMC-Butner, BOP has been sensitive to concerns about any impact that this might have on Quan. For example, BOP's medical records clearly indicate that BOP decided not to treat Quan locally "unless the radiation/oncologist deems it urgent." *See* Defendant's Mot. Exh. 5. Implied in that decision is the fact that BOP would have treated Quan locally, if it was urgent to begin treatment more quickly than would be the case at FMC-Butner. BOP also is prioritizing Quan's transfer to FMC-Butner, where it will "resume care of his cancer in February" (that is, this month). *See* Brunner Decl. Exh. A at 6. And, BOP has continued to provide Quan hormone-suppression treatment, administering his second injection of Leuprolide Acetate on January 14, 2021, to support his prompt treatment once he arrives at FMC-Butner. *See* Brunner Decl. ¶ 5 & Exh. A at 7-9.

### 4. Quan's Other Medical Conditions

In addition to prostate cancer, and COVID-19 from which he has now recovered, Quan suffers a number of other medical conditions. According to Quan, *see* Defendant's Mot. at 3-4, and as supported by Quan's medical records, these include chronic back pain, a tortuous aorta (a twisting of the aortic artery), cataracts, chest congestion and cough, shoulder pain, and gastroesophageal reflux. He also had a previous cases of tuberculosis. Significantly, these ailments were known by the parties and, presumably, considered by the Court, at the time of Quan's recent sentencing. *See, e.g.,* PSR at ¶¶ 46-51.

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 7
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### E. Quan's Request for Compassionate Release

On December 17, 2020, Quan filed a form BP-9 with the Warden of FDC- SeaTac requesting compassionate release based on his age and medical conditions, his risk of COVID-19, and his need for treatment for his prostate cancer. *See* Defendant's Mot. Exh. 6. To the best of the United States' knowledge, the Warden has yet to act upon that request.

## III.   ARGUMENT

This Court should deny Quan's motion, because Quan has not established an extraordinary and compelling reason for his release, because Quan would present a danger were he to be released, and because consideration of the 18 U.S.C. § 3553(a) factors does not support reducing Quan's sentence.

### A. The Legal Standard for Compassionate Release

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). Consistent with that principle, 18 U.S.C. § 3582(c) provides that a court "may not modify a term of imprisonment once it has been imposed," except under three specified circumstances, one of which is a motion under subsection 3582(c)(1)(A). Section 3582(c)(1)(A) provides a court with jurisdiction to reduce an otherwise final sentence where a defendant establishes: (1) the exhaustion requirements in the statute have been satisfied; (2) an extraordinary and compelling reason supports the motion; and (3) any reduction is consistent with the applicable policy statement. 18 U.S.C. § 3582(c)(1)(A).

28 U.S.C. § 994(t) directs the Sentencing Commission to draft the referenced policy statement. That policy statement, found at USSG § 1B1.13, directs that before reducing a final sentence, in addition to an "extraordinary and compelling reason" supporting the reduction, a court must find (1) that the defendant does not present a danger to others and the community, and (2) that the reduction is appropriate after considering the factors in 18 U.S.C. § 3553(a). As relevant to the defendant's motion, the application notes then provide that "extraordinary and compelling" reasons exist certain circumstances, including:

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 8
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

    (A)    Medical Condition of the Defendant.—

        (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia [or]

        (ii)    The defendant is—

                (I)    suffering from a serious physical or medical condition,

                (II)    suffering from a serious functional or cognitive impairment, or

                (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13 cmt. n.1.

Based on the statutory text, the policy statement referenced in § 3582(c)(1)(A) is binding on this Court and controls how this Court is to exercise its discretion. *Cf. Dillon v. United States*, 560 U.S. 817, 827 (2010). In *Dillon*, when addressing the identical language contained in 18 U.S.C. § 3582(c)(2), the Supreme Court held that, based on this language, the limitations contained in the Commission's pertinent policy statement constituted a limitation on a district court's discretion to reduce sentences. *See Dillon*, 560 U.S. at 826. Because both subsections of § 3582(c) follow the same prefatory language, there is no reason to conclude that the policy statement applicable to § 3582(c)(1)(A) is other than binding.

Four circuit courts of appeal have now concluded that, because USSG 1B1.13 has not been amended since enactment of the First Step Act, it is not binding for motions filed by defendants. *See United States v. Brooker (Zullo)*, 976 F.3d 228 (2d Cir. 2020); *United*

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 9
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

*States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020); and *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020). These cases are, of course, not binding on this Court, and to date, the Ninth Circuit has not addressed this precise issue.[1] And, the Ninth Circuit has continued to cite to USSG § 1B1.13 in various cases affirming a district court's denial of motions for compassionate release. *See e.g.,* United *States v. Arceneaux*, _ F. App'x. _, 2020 WL 7230958 (9th Cir. Dec. 8, 2020); *United States v. Mortensen*, 822 F. App'x. 634 (9th Cir. Sept. 8, 2020).[2] The government continues to take the position that the conclusion in these out-of-circuit decisions is flawed.

Moreover, even if the policy statement is not binding, this Court may continue to choose to apply the factors that are set out in the application notes to USSG § 1B1.13, since those notes reflect the Sentencing Commission's thoughtful consideration of the issue. In that regard, the observations of the Seventh Circuit in *Gunn* are instructive. After concluding that the policy statement was not binding, *Gunn* nonetheless observed:

> The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive.

*Gunn*, 980 F.3d at 1180.

---

[1] The issue is now squarely before the Ninth Circuit in at least one pending fully-briefed case. *See United States v. Rice*, C.A. No. 20-10207. The Court recently chose not to address this issue in *United States v. Markillie*, ___ F. App'x ___, 2021 WL 276350 (9th Cir. Jan. 27, 2021).

[2] The same is true for the Third, Fifth, Tenth and Eleventh Circuits. Those circuits have treated USSG § 1B1.13 as applicable to defendant filed motions. *See United States v. Thompson,* _ F.3d. _, 2020 WL 27493 (5th Cir. Jan. 5, 2021); *United States v. Wedgeworth*, _ F. App'x _, 2020 WL 7389350 (11th Cir. Dec. 16, 2020); *United States v. Saldana*, 807 F. App'x 816, 819–820 (10th Cir. 2020); *United States v. Doe*, 2020 WL 6328203 *1 (3rd Cir. Oct. 29, 2020) (per curiam). Finally, the issue is now pending before the Tenth Circuit in a government appeal. *See United States v. MauMau*, C.A. No. 20-4056, USCA 10th Circuit. Oral argument in that appeal took place on September 22, 2020. It is also pending in a Fifth Circuit Appeal. *See United States v. McLin*, C.A. No. 20-60615, USCA 5th Circuit.

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 10
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In sum, applying the statutory requirements, to be eligible for a reduction in sentence, a defendant must first meet the exhaustion requirements. Assuming exhaustion, the defendant must then establish three things. First, the defendant must present an "extraordinary and compelling" reason for release. Second, the defendant must establish that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13. S*ee also United States v. Gotti*, No. 02-cr-743-CM, 2020 WL 497987 (SDNY 2020) (finding that release was inappropriate because defendant posed a continuing danger to the public). And, third, the defendant must establish that a reduction is appropriate in light of the factors in 18 U.S.C. § 3553(a).

Applying these standards, a sentence reduction is not appropriate in this case.

**B.     Quan Has Not Met the Standard for a Reduction on Sentence.**

*1.     The Exhaustion Requirement*

Quan has satisfied the exhaustion requirement. As set forth in his motion, on December 17, 2020, Quan, through counsel, submitted a request for compassionate release to the warden of FDC-SeaTac. To date, the Warden has not acted upon that request, and more than 30 days have expired.

*2.     Quan has not Shown an Extraordinary and Compelling Reason*

To be eligible for compassionate release, a defendant bears the burden to show an "extraordinary and compelling reason" that meets the high bar set by Congress and the Sentencing Commission. *United States v. Powers*, 2020 WL 3605748 *1 (W.D. Wash. July 2, 2020); *Riley v. United States*, 2020 WL 1819838 at *7 (W.D. Wash. Apr. 10, 2020). "[A] compassionate release . . . is an extraordinary and rare event." *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020). "In general, chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020). And, of course, compassionate release is not a tool to "correct" a judgment. *Id.*

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 11
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

      a. *Quan's Prostate Cancer Does Not Constitute an Extraordinary and Compelling Reason for his release.*

Quan's central claim is that continued imprisonment will delay needed cancer treatment. In fact, Quan so far has received excellent treatment for his cancer, and he will continue to do so under BOP's treatment plan.

First, it is likely that Quan's cancer would not even have been detected, but for the medical treatment that he has received as a result of being incarcerated. *See* PSR Sent. Rec. (indicating that Quan's brother believes that the cancer would not have been detected otherwise). Second, BOP has provided Quan with good care since Quan's diagnosis. Before and since detecting that cancer, BOP has provided Quan access to a private urologist (Dr. Reed) and a private oncologist (Dr. Song) to develop treatment options. And, once Quan elected radiation treatment with hormone suppression therapy, BOP has provided Quan hormone-suppression injections to allow that treatment to commence.

Quan complains that his actual treatment has been delayed, but the delay that he has experienced is slight. Dr. Song indicated in October, that he expected Quan's treatment to begin within two-to-three months of beginning hormone suppression treatment. Quan received his first hormone-suppression injection in early October. As a result, Dr. Song's expectation was that Quan would begin treatment by early January. That treatment was delayed by the COVID-19 pandemic, and, in particular, because of Quan's own case of COVID-19, *see* Defendant's Mot. Exh. 5 (indicating that Quan's appointment with Dr. Reed had been cancelled due to Quan's COVID-19, and that Dr. Reed would not see Quan until two weeks had passed and Quan had tested negative for COVID-19). But, BOP's current plan still calls for Quan to begin treatment in February 2021. As a result, the total delay in Quan's treatment is likely to be limited.

Third, Quan will receive good treatment from BOP prospectively. BOP is providing the treatment course that Quan himself has chosen (radiation with hormonal suppression therapy). And, BOP believes the limited period of period of delay in transferring Quan's treatment to FMC-Butner will not negatively affect Quan. *See* Defendant's Mot. Exh. 5

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 12
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(indicating that Quan would not be transferred to FMC-Butner, but would instead be treated locally, if Quan's oncologist deemed it "urgent"). This conclusion draws support from the fact that, while prostate cancer is a potentially-deadly disease, it also is among the most common and most treatable forms of cancer. Indeed, according to the Prostate Cancer Foundation, "[t]he 5-year survival rate in the United States for men diagnosed with prostate cancer is 99%." *See* https://www.pcf.org/about-prostate-cancer/what-is-prostate-cancer/prostate-cancer-survival-rates/.

Even if Quan had been released, his treatment may well have been delayed. For example, if Quan contracted or had a close exposure to COVID-19, his treatment would have been delayed, just as it has been delayed while he has been incarcerated. And, in fact, going forward Quan may well have a better chance to receive prompt treatment at FMC-Butner, where all services currently are onsite and accessible, than he does in the community, since many community-treatment centers are currently closed or experiencing interrupted service due to the COVID-19 outbreak.

In sum, Quan's prostate cancer is a "condition[] that can be managed in prison"; as a result, it is "not a sufficient basis for compassionate release." *Ayon Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020).

      b. *Quan's Age, Medical Condition, and COVID-19 Risk Do not Constitute an Extraordinary and Compelling Reason for his release.*

Quan's age, 68, general medical condition, and COVID-19 risk also do not constitute "extraordinary and compelling reasons" for his release.[3] That is the case because Quan already has contracted, and recovered from, COVID-19, and therefore likely has immunity. Moreover, BOP has begun vaccinating inmates against COVID-19 and can be expected to vaccinate all willing inmates in the relatively-near future.

---

[3] Quan's motion notes that the United States "typically concedes" that an inmate diagnosed with medical conditions that are risk factors for COVID-19 has demonstrated an "extraordinary and compelling" reason for compassionate release. *See* Defendant's Mot. at 6. But, Quan's infection with, and recovery from, COVID-19, and the development of COVID-19 vaccinations make the rationale for such a concession inapplicable in Quan's case.

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 13
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As of October 27, 2020, the CDC has stated that while cases of reinfection have been reported, they remain rare. And, research increasingly shows that people who have contracted COVID-19 and recovered gain lasting immunity. *See* Immunity to the Coronavirus May Last Years, New Data Hint, New York Times (Nov. 17, 2020). At least one study suggests that the such reinfection is highly unlikely for at least six months, while another study suggests that immunity could last much longer. *See* Post-Infection Coronavirus Immunity Usually Robust after 8 Months, Study Shows, Washington Post (Jan. 7, 2021). Partly for this reason, several judges from this Court have denied relief to defendants who already had COVID-19. *See e.g., United States v. Daza-Cortez*, 2020 WL 3451959 (W.D. Wash. June 24, 2020); *United States v. Ballenger*, 2020 WL 3488157, at *3-4 (W.D. Wash. June 26, 2020); *United States v. Molley*, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020).

Even if Quan's bout of COVID-19 does not provide lasting immunity, BOP already is receiving doses of the two available COVID-19 vaccines and aggressively pursuing the vaccination of staff and inmates. Although BOP is prioritizing staff for vaccination first, because of their possibility of exposure within the community, inmates at facilities receiving doses also are being vaccinated. A press release that the BOP issued on January 15, 2021, reported that 5,457 inmates had received the first dose of a vaccine and an additional 1,051 inmates already had received both doses. According to the BOP website, as of February 2, 2020, BOP has received 36,285 doses of vaccine, and already has administered 32,879 doses. Indeed, almost 4,000 inmates already have been fully vaccinated (i.e., received both doses). This includes 485 inmates at the Butner complex. See https://www.bop.gov/coronavirus/. As more doses of vaccine are released and shipped, BOP can be expected to act with equal speed to vaccinate remaining staff and inmates. As a result, general concerns regarding COVID-19 in BOP institutions should lessen long before Quan's immunity erodes, as should Quan's own exposure, assuming he accepts a vaccine.

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 14
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Quan's age and medical condition also fall far short of establishing an "extraordinary and compelling reason" reason for his release, in the absence of consideration of COVID-19. While Quan is over 65 years old, he is not experiencing a serious deterioration in physical or mental health because of the aging process. As a result, Quan's age and general medical condition fall far short of the standards set forth in the policy statement contained in the Application Notes to § 1B1.13. They also fall short, in any objective analysis, even without reference to that policy statement.

### 3. Quan is a Danger.

Quan also does not qualify for release because he cannot establish that he would not be a danger to the community were he to be released. Quan's criminal history – most notably, his 1983 conviction for possessing explosives that he strapped to someone's truck as part of a murder-for-hire plot – shows that he is willing to use firearms and explosives to commit violence. And his current crime, which involved his acquisition and possession of an arsenal of deadly weapons and ammunition, proves that he remains a danger.

Quan attempts to explain his conduct by suggesting that he merely acquired the firearms due to a "life-long fascination with firearms," and he notes that there was no evidence he used the firearms. Defendant's Mot. at 8. Quan's explanation is not credible, because it does not explain the massive amount of ammunition that Quan possessed. A collector does not need thousands of rounds of near-identical ammunition. Whether Quan previously had used the firearms or not, Quan's acquisition of large amounts of ammunition suggests an intent, or at least preparation, to use the firearms. In addition, Quan's failure to secure the weapons and ammunition, means that they were readily available to others who might do so.

We live in an era of regular mass shootings by people with assault weapons, semiautomatic firearms, large-capacity magazines, and, occasionally bump stocks. Remarkably, Quan possessed every one of those items in this case, and he possessed large amounts of ammunition. Quan's history of dangerous firearms crime, and his assembly of an arsenal that would allow him (or a roommate with ready access to the firearms) to

United States' Response to Defendant's Motion for Compassionate
Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 15
*United States v. Quan*, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

commit such a crime make him an obvious danger. And, because of that danger, Quan is not entitled to compassionate release.

### 4. The § 3553(a) Factors Do Not Support Quan's Release.

Even if this Court were to conclude that Quan's medical condition constitutes an "extraordinary and compelling" reason to reduce his sentence, Quan also would need to establish that a reduction in his sentence was warranted after consideration of the factors in 18 U.S.C. § 3553(a). But, this Court weighed those very same factors barely three months ago, at Quan's sentencing. In particular, it, presumably, considered the nature of Quan's offense, his history, the very real danger that Quan posed to others, and the need to punish him and to deter others from similar firearms crimes. Nothing about those concerns has changed since Quan's recent sentencing. As a result, this Court should not find that Quan is entitled to compassionate release.

### IV. CONCLUSION

For all of the above reasons, Quan's motion for compassionate release should be denied.

DATED: this 2nd day of February, 2021.

Respectfully submitted,

BRIAN T. MORAN
United States Attorney

s/ Andrew C. Friedman
ANDREW C. FRIEDMAN

s/ Steven Masada
STEVEN MASADA
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone: (206) 553-7970
Fax: (206) 553-0882
E-mail: Andrew.Friedman@usdoj.gov
Steven.Masada@usdoj.gov

United States' Response to Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) - 16
United States v. Quan, CR19-148JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970